CHICAGO, M. & ST. P. RY. CO. et al. v. CLEMENT.

(Circuit Court of Appeals, Ninth Circuit. August 20, 1917.)

No. 2900.

1. RAILROADS ⬤➡344(1)—CROSSING ACCIDENT—LAST CLEAR CHANCE—COMPLAINT.

Complaint in action for death from collision, at railroad crossing, of engine with inclosed milk wagon, *held* to state a cause of action under the last clear chance doctrine.

2. RAILROADS ⬤➡350(33)—CROSSING ACCIDENT—LAST CLEAR CHANCE—QUESTION FOR JURY.

Under the evidence in action for death from collision, at railroad crossing, of engine with inclosed milk wagon, *held*, that whether the company had the last clear chance to avoid the accident was for the jury.

In Error to the District Court of the United States for the District of Montana; Geo. M. Bourquin, Judge.

Action by David Clement against the Chicago, Milwaukee & St. Paul Railway Company and others. Judgment for plaintiff, and defendants bring error. Affirmed.

The defendant in error was plaintiff in the court below in this action, there brought against the present plaintiffs in error as defendants, to recover for the loss of his son's earnings from the time that he was run over and killed by an engine of the Chicago, Milwaukee & Puget Sound Railway Company to the time he would otherwise have attained his majority. The jury awarded the plaintiff damages in the sum of $2,500, which amount the trial court ruled, on motion made for a new trial, was excesssive to the extent of $1,000. The excess was remitted by the plaintiff under permission granted in an order of the court, and judgment was entered for the plaintiff for $1,500 and costs.

George F. Shelton, Fred J. Furman, and A. J. Verheyen, all of Butte, Mont., for plaintiffs in error.

B. K. Wheeler and James H. Baldwin, both of Butte, Mont., for defendant in error.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

ROSS, Circuit Judge (after stating the facts as above). The only point made on behalf of the plaintiffs in error that we think worthy of mention is the contention that neither the complaint as amended nor the evidence justified the recovery on the ground that the defendant railway company had "the last clear chance" to avoid the fatal collision, and negligently failed in its duty to do so—the pleading and the evidence being based on that doctrine.

[1] In effect, the amended complaint alleges that at the time of the accident the deceased was of about the age of 15 years; that the defendant Woods was the locomotive engineer in charge of the engine, and the defendant Chappell was foreman of the engine crew, and was riding upon the engine operated by Woods, and directed its movements; that at about 4 o'clock in the morning of November 5, 1912, the boy was riding in an inclosed milk wagon drawn by a pair of horses which he was driving, and going in a northerly direction on Montana street in the city of Butte, Mont., toward and near the intersection of the railway company's tracks with the said street, and was not observant of the approach of the train passing along the track in a westerly direction, the engine of which train, in charge of Woods and Chappell, was being used at the time for switching purposes in the yards of the railway company; that both the engineer and Chappell saw the boy coming directly in the path of the engine, and that he was in danger of being struck by it, and that the boy was "unobservant of the approach of the said engine," and, after so seeing the danger, negligently drove the engine against the vehicle in which the boy then was, without giving him any warning of the approach of the train, and without lowering the gates which were at the said crossing; and that by reason of the said negligent operation of the engine the boy was so injured that his death resulted therefrom. We see nothing lacking in these allegations to constitute a cause of action.

[2] It appears from the evidence that at the time of the accident the engine was going westerly and backing, drawing 12 cars loaded with coal and coke, while the boy with the team was approaching the crossing on a road running northerly. East of the crossing, and extending to within a few hundred feet of it, there was a curve in the railroad, and there was also a slight grade there. The night was clear and crisp—cold enough for some frost on the rails. Woods, the engineer, was at his place in the cab, and Chappell was standing on a running board at the rear end of the engine to give the engineer such warnings as should be needed. The testimony of both of those men was given, as well as that of other witnesses.

According to the testimony of the engineer, before reaching the curve the train was moving at about 8 miles an hour, when he applied a little air to the brakes in order to take the curve properly, which

reduced the speed to about 6 miles an hour. No sand was applied for the reason, as stated by the engineer, that in rounding the curve the pipes would have thrown the sand outside of the rails; but there was other testimony that some sand would have fallen upon the rails. While on the curve, and when, according to the testimony of Chappell, about 400 feet from the crossing, the usual crossing signal of the road in question was given, consisting of one long and two short blasts.

Chappell testified, among other things, that he first saw the team when the train reached the point where the view was unobstructed, at a distance of about 330 to 340 feet; that it was going at a little jog of a trot of about 4 miles an hour, which was not slackened; that he could see that the lines were slack. "I could see the lines," said the witness, "after I—I don't know just what the distance was that I could see the lines, but the slack wasn't taken out of them at the point where I could see them. There was never any effort on his part made to stop that I could see. There was no effort, and the team wasn't checked at any time; they continued in their same gait all the time that I seen them, until the engine struck the wagon." Chappell also testified that at the time of the collision the train was going about 5 miles an hour.

Neither Chappell nor the engineer, according to their testimony, saw the boy at all; but the engineer testified that he also saw that the lines were slack when he got within about 75 feet, and that the horses did not slacken their speed at all until the accident happened. He further testified as follows:

"When I got within about 150 feet or 200 feet of the crossing, I see a team driving up there along the road. The team was approaching at a pretty fair trot; I should judge the team was going 5 miles an hour. It was a covered wagon. I did not see any driver then. I first saw the occupant of the wagon after we stopped, and I got off of the engine and went back and met Mr. Chappell, and we went back to where the boy was laying between the cars; that is the first time that I saw anybody."

Chappell testified, among other things, that when he gave the first signal to the engineer to slow up he was approximately 150 feet east of the crossing, and that when he gave the signal to stop he was from 75 to 100 feet from the crossing; that there was what is called a stopcock on the back of the engine, about a foot away from where he was standing, the opening of which would have enabled the engine to have stopped quicker, which stopcock he failed to open; that he did not "realize that it was necessary, as the engineer could work the brakes from the engine with the same effect as opening the angle cock, until it was too late for me to reach down and open it with my hand," but that before jumping he tried to kick it open, but failed.

The engineer, Woods, also testified that when he got within 75 feet of the crossing, and saw that the team showed no signs of stopping, he did everything in his power to stop the engine; "that is," said the witness, "I throwed the air in the emergency; that is all that I could do. At that time the bell was ringing; the bell was ringing at the time of the collision. I observed the rails after the accident; when I got off the engine I noticed they were frosty. I did not use sand that

morning; it was on a curve; there was no use using sand, on account of the pipes are bent so that it would just throw it to the side of the rail."

There was also testimony given tending to show that, at the speed at which the train was moving at the time in question, it could have been stopped within from 15 to 25 feet; and Chappell testified that it could have been stopped within from 25 to 40 feet. There can, of course, be no doubt that the boy was guilty of contributory negligence; but his peril, according to the testimony, being known to the operators of the train, whether or not the company had the last clear chance to avoid the accident was, in view of the evidence, a question for the jury. Great Northern Railway Co. v. Harman, 217 Fed. 959, 133 C. C. A. 631, L. R. A. 1915C, 843, and numerous cases there cited.

The instructions upon that question given to the jury by the court below were full, clear, and correct, and we must, accordingly, affirm the judgment.

The judgment is affirmed.